# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

DAVID W. FOLEY, JR.; and JENNIFER
T. FOLEY,

                Plaintiffs,

vs.                                                                Case No. 6:12-cv-269-Orl-37KRS

ORANGE COUNTY,

                Defendant.

_____

## ORDER

This cause is before the Court on the following:

1.      Defendant Orange County's Motion to Dismiss (Doc. 175), filed January 31, 2013;

2.      Plaintiffs' Response to County's Motion to Dismiss (Doc. 182), filed February 14, 2013;

3.      Defendant Orange County's Dispositive Motion for Final Summary Judgment (Doc. 261), filed June 14, 2013;

4.      Plaintiffs' Motion for Summary Judgment (Doc. 269), filed June 14, 2013;

5.      Plaintiffs' Response to Defendant Orange County's Motion for Summary Judgment (Doc. 277), filed June 28, 2013;

6.      Defendant Orange County's Response in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 282), filed July 15, 2013;

7.      Plaintiffs' Supplemental Response in Opposition to Orange County's Motion for Summary Judgment (Doc. 285), filed July 22, 2013;

8.      Plaintiff's Reply to Defendant Orange County's Response in Opposition to

Plaintiffs' Motion for Summary Judgment (Doc. 286), filed July 31, 2013;

9.    Defendant Orange County's Reply in Support of Summary Judgment (Doc. 287), filed August 5, 2013.

## BACKGROUND

Plaintiffs are residents of Orange County, Florida, who own and raise toucans. (Decl. ¶¶ 10, 20.)[1] They bring several claims against Orange County based on their efforts to operate a commercial aviary out of their residence, which is located in a residential-only zoned area of the county, and another parcel of property that is located in rural-use zoned area of the county. (*Id.* ¶¶ 12–19.) Plaintiffs contend, writ large, that portions of Orange County's land use ordinances, which prohibit the operation of a commercial aviary at the residence altogether and at the second property absent a special use permit, conflict with a provision of the Florida Constitution that provides the Florida Fish and Wildlife Commission with all of the "regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life." Art. IV, § 9, Fla. Const.

The dispute arose after Orange County received a citizen's complaint regarding Plaintiffs' business. (Decl. ¶ 39.) County code enforcement officers investigated the complaint and cited Plaintiffs for building accessory buildings at their residence without the necessary permits. (*Id.* ¶¶ 41, 51.) During the pendency of the ensuing code enforcement proceedings, Plaintiffs requested the county zoning manager provide them

---

[1] Plaintiffs, in violation of the Local Rules, attempt to incorporate by reference over 200 pages of materials to the Amended Complaint. While Plaintiffs' complaint and attachments are voluminous, most of the relevant facts are set forth in an attached declaration. (Doc. 164, Exhibit 14.) The Court will construe the declaration as alleging the factual support for the complaint and in this Order will refer to the allegations it contains as "Decl."

with an official determination as to whether they were authorized to operate a commercial aviary at their residence. (*Id.* ¶ 69.) The manager determined that the operation of a commercial aviary at the residence was not authorized as a primary or secondary use under Orange County's land use ordinances, and he determined further that a commercial aviary was not an authorized home occupation. (Doc. 163, Ex. 10.) Plaintiffs appealed the manager's determination to the board of zoning adjustment and then the board of county commissioners, but failed to convince either body to overturn the manager's interpretation of the ordinances. (Decl. ¶¶ 83, 98, 101, 121.) Plaintiffs filed actions in state court for reviews of the code enforcement proceedings and the determination proceedings; however, in both cases, the courts determined that Orange County did not err. (*Id.* ¶¶ 123–124.) Plaintiff then filed this action.

Plaintiffs' initial 67-page complaint brought numerous federal and state claims against Defendant Orange County and a number of individual defendants. Plaintiffs sought, and were granted leave to amend their initial complaint. (Doc. 88.) They filed a 92-page Amended Complaint on May 14, 2012, which once again brought numerous federal and state claims against Defendant Orange County and a number of individual defendants. (Doc. 85.) The Court dismissed all claims in Plaintiff's amended complaint and struck it as improper on December 4, 2012. (Doc. 150.) The Court dismissed the claims against all of the individual defendants with prejudice, and dismissed without prejudice those brought against Orange County. (*Id.*) The Court directed Plaintiffs to file a Second Amended Complaint that set forth only claims against Orange County. (*Id.*)

The Second Amended Complaint—like its predecessors—is verbose, filled with irrelevant discussions of legal issues, and attempts to bring federal and state claims against Defendant Orange County and a number of individual defendants. (Doc. 162.)

While the Second Amended Complaint sets forth its federal and state law claims in just 39 pages, it also incorporates by reference three appendices totaling over 200 pages of material. Such incorporation by reference violates Local Rule 4.01. Rather than dismissing the complaint yet again, the Court will treat the declaration that is part of Appendix B (Doc. 164, Exhibit 14) as setting forth Plaintiffs' allegations of fact.

The Court construes the Second Amended Complaint as presenting a state-law claim that seeks a declaration that portions of Orange County's land use ordinances are void.[2] The Court also construes the Second Amended Complaint as raising five federal claims. The first federal claim is a substantive due process challenge to Orange County's land use ordinances.[3] Plaintiffs' second federal claim is a "class of one" equal protection claim. Their third federal claim is one for "compelled speech" in violation of the First Amendment, and their fourth federal claim alleges Orange County's ordinances act as prior restraints to Plaintiffs' commercial speech rights. Plaintiffs' final federal claim is that Orange County's land use proceedings are searches and seizures that violate

---

[2] This claim is not subject to res judicata or estopped by Plaintiffs' state court actions, which were in nature of an administrative review of an executive action. Indeed, in those proceedings, the state court notified Plaintiffs of the need to file an independent civil action to challenge the constitutionality of the land use ordinances. (*See* Doc. 26, Ex. A; Doc. 66, Ex. 1; Doc. 67, Ex. 2.)

[3] The Court construes this claim as a facial substantive due process claim to three provisions—Section 38-1, Section 38-77, and Section 38-79(48)—of Orange County's zoning ordinance as well as a challenge to Orange County's application of those provisions to Plaintiffs' residence. *See Eide v. Sarasota Cty.*, 908 F.2d 716, 721–22 (11th Cir. 1990). Plaintiffs cannot bring an as applied substantive due process challenge in connection with their second property because they have not shown that Orange County has applied the ordinances to that property. *See id.* at 724–25; *see also Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 197–200 (1985) (refusing to adjudicate the plaintiff's due process claims in a dispute concerning lad use regulations because the plaintiff "failed to apply for variances from the regulations"). In other words, the claim that relates to the rural property is not ripe.

Plaintiffs' Fourth Amendment rights.[4]

The parties have conducted discovery and filed cross motions for summary judgment. These motions are now ripe for adjudication. The relevant facts are not disputed.[5]

## STANDARDS

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To defeat a motion for summary judgment, the nonmoving party must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded

---

[4] The Second Amended Complaint purports to bring claims against Defendants other than Orange County without leave. Because the Court had previously dismissed those claims with prejudice (Doc. 150), the Court issued an Order informing those parties that they need not respond to the Second Amended Complaint and directing the clerk to terminate them as parties to this action (Doc. 168). In this Order, the Court considers only those claims in the Second Amended Complaint that Plaintiffs assert against Defendant Orange County. To the extent Plaintiffs intend to bring claims against any other defendant, such claims are hereby dismissed because Plaintiffs' were not granted leave to assert such claims in their amended pleading. As an additional basis for dismissal, if one is needed, the Court also dismisses those claims as a sanction for Plaintiffs' failure to abide the Court's Order to comply with the Rule 8 and Rule 10 of the Federal Rules of Civil Procedure.

[5] Plaintiffs' residence is classified as R-1A by the county's land use ordinances. Plaintiffs own or have an interest in a toucan breeding business. Mr. Foley and his business were issued permits that authorized the possession and sale of the birds at the residential property. And Orange County has prohibited Plaintiffs from operating their toucan breeding business at their residence.

particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

"Cross motions for summary judgment do not change the standard." *Perez-Santiago v. Volusia Cnty.*, No. 6:08-cv-1868-Orl-28KRS, 2010 WL 917872, at *2 (M.D. Fla. Mar. 11, 2010) (quoting *Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007)) (internal quotation marks omitted); *see also Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Santiago*, 2010 WL 917872 at *2 (citations and internal quotation marks omitted). When considering cross-motions for summary judgment, the Court must "consider and rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999) (citations omitted).

## DISCUSSION

Plaintiffs' core dispute with Orange County—that the county has no authority to regulate their toucan breeding business—is encapsulated in their state-law claim. The Court will therefore discuss that claim first. The Court then addresses the merits of Plaintiffs' federal claims.

### I.  State Law Claims

The Court construes Plaintiffs' Second Amended Complaint as seeking a declaration that certain portions of Orange County's land use ordinances are void under Florida law. To address this claim, the Court must first review the county's land use ordinances and then describe in detail the ordinances challenged by Plaintiffs. The Court then reviews Florida's legislative and regulatory scheme for the possession and

sale of captive wildlife. The parties dispute how these two regulatory schemes interact.

### A. Orange County's Land Use Ordinances

Orange County is a charter county that possesses in accordance with Article 8, section 1(g) of the Florida Constitution, "all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors." As such, it "may enact county ordinances not inconsistent with general law." *Seminole Cty. v. City of Winter Springs*, 935 So. 2d 521, 523 (Fla. 5th DCA 2006). This is a direct constitutional grant of broad powers of self-government. *Id.* It is pursuant to this constitutional delegation of the state's police power that Orange County enacted a comprehensive set of land use regulations. *See* Fla. Stat. § 125.66.

Orange County divides the land within its boundaries into land use districts. Ch. 38, Art. IV, § 38-71, Orange County Code ("OCC"). These districts are designated, among other things, for commercial use, agricultural use, and residential use. *Id.* § 38-77. The ordinances identify land uses—those that are permitted, those that are prohibited, and those that may be allowed if a special exception is granted by the county—by reference to a use table. *Id.* §§ 38-74, 38-77. The use table's rows and columns denote different land use districts and land uses. *Id.*

Plaintiffs' residence is located in the R-1A zone, which is "intended to be single-family residential areas with large lots and low population densities" Ch. 38, Art. VI, § 38-301, OCC. The county's ordinances permit Plaintiffs to use their residence for only those categories of land uses that are designated *P* in the land use table and, if they apply for and are granted a special exception, those categories of land uses designated *S. Id.* § 38-302, 38-303. If the table contains a number, then another section of the zoning ordinances imposes certain conditions with which a property owner must comply

in order to engage in that land use. *Id.* § 38-79. If the land use table is blank for a particular land use category, then that use is prohibited in that district. *Id.* § 38-304. The ordinances define some of the categories listed in the land use table. The land use table designates "commercial aviculture, aviaries" as a category of land use. An aviary is defined as "an enclosure for holding birds, excluding poultry, in confinement." Ch. 38, Art. I., § 38-1, OCC. "A*viculture (commercial)*" is defined as "the raising, breeding and/or selling of exotic birds, excluding poultry, for commercial purposes." *Id.* The definition also directs that a commercial purpose is present if any one of the following conditions are satisfied:

(1)   The operation exists with the intent and for the purpose of financial gain;

(2)   Statements of income or deductions relating to the operation are included with routine income tax reporting to the Internal Revenue Service;

(3)   A state sales tax identification number is used to obtain feed, supplies or birds;

(4)   An occupational license has been obtained for the operation;

(5)   Sales are conducted at the subject location;

(6)   The operation involves birds or supplies which were purchased or traded for the purpose of resale;

(7)   The operation involves a flea market or commercial auction, excluding auctions conducted by not-for-profit private clubs;

(8)   The operation or activities related thereto are advertised, including, but not limited to, newspaper advertisements or signs; or

(9)   The operation has directly or indirectly created traffic.

*Id.* The ordinances define poultry as "domestic fowl such as chickens, roosters, turkeys, ducks, geese, pigeons, etc." *Id.* No definition is supplied for non-commercial aviculture, nor is any such category listed in the land use table. *Id.* The land use table designates instead the "breeding, keeping, and raising of exotic animals" as another category of land use. Ch. 38, Art. IV, § 38-78, OCC. This category is left undefined. The land use table is blank in reference to an R-1A district for the "commercial aviculture, aviaries"

and "breeding, keeping, and raising of exotic animals" categories. *Id.* Land uses falling within these categories are therefore prohibited. Ch. 38, Art. VI, § 38-304, OCC.

### B.  The Possession and Sale of Captive Wildlife in Florida

All wildlife in Florida is controlled and regulated by a state agency called the Florida Fish and Wildlife Conservation Commission. The commission was created by the Florida Constitution and given "the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life," Art. IV, § 9, Fla. Const.

The current incarnation of the commission was formed after voters adopted a proposal of the 1998 Constitutional Revision Commission to merge the former Game and Fresh Water Fish Commission "GAME Commission"), which was a constitutional agency, and the Marine Fisheries Commission, which was an agency created by statute. *Caribbean Conservation Corp. v. Florida Fish & Wildlife Conservation Comm'n*, 838 So. 2d 492, 497–99 (Fla. 2003). While the Game Commission was created in 1942, it did not have the power to regulate captive wildlife until the Florida Constitution was revised in the late 1960s. *Compare Barrow v. Holland*, 125 So. 2d 749, 751 (Fla. 1960) (concluding that Art. IV, § 30 of the Florida Constitution of 1885, which authorizes the creation of the Game Commission, did not provide the commission with the power to regulate captive wildlife) *with* Art. IV, § 9, Fla. Const. (authorizing the Game Commission to carry out "the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life.").

The commission has exercised the powers given to it by promulgating rules regulating the possession and sale of captive wildlife, which are found in chapter 68A of the *Florida Administrative Code*. Rule 68A-1.002 of the Code declares that "[a]ll wild animal life within the jurisdiction of the State of Florida, whether such wild animal life is

privately owned or otherwise, is subject to the regulation of the Commission." The regulations require all persons, except in limited circumstances not relevant here, to obtain a permit from the commission in order to lawfully "possess any native or non-native wildlife in captivity." Fla. Admin. Code R. 68A-6.0011.

Such permits are issued in three classes. A class I permit is required to possess animals such as lions, tigers, and bears. *Id.* 68A-6.002(1)(a), 68A-6.0022(1). A class II permit is required to possess animals such as monkeys, the smaller members of taxonomic family *Felidae*, and some members of the family *Canidae*. *Id.* 68A-6.002(1)(b), 68A-0022(1). If a category of wildlife is not listed as class I or class II, and it is not identified as an enumerated exception, then a person must obtain a class III permit to possess and sell the animals. *Id.* 68A-6.002(1)(c), 68A-6.0022. Permits issued by the commission are labeled as "Licenses to Sell or Exhibit" and specifically identify the animals that the licensee is authorized to possess. (*See, e.g.*, Doc. 264-1.)

The commission requires persons possessing wildlife to obtain documentation regarding the source and supplier of every animal, as well as document the birth, death, and sale of every animal. *Id.*; *see also id.* 68A-6.006. A permit holder is obligated under the Code to maintain these records, make them available upon request, and allow the inspection of the facility housing the wildlife. *Id.* 68A-4.006. The commission specifically requires any person engaged in the business of breeding exotic birds to obtain a permit from the commission.[6] *Id.* 68A-6.006(1).

The commission has forbidden the possession of class I wildlife for personal use, *id.* 68A-6.0021(1), which the Court construes to mean wildlife maintained in captivity as

---

[6] The rules regarding the sale of captive exotic birds are murky, but are not central to the resolution of the dispute between the parties because there is no dispute that Plaintiffs' business is intended to be a commercial breeding operation.

a personal pet, *see id.* 68A-1.004(55) (defining the term "personal pet"). Indeed, the commission presumes that "the possession of wildlife . . . is commercial in nature," and (unless one qualifies as a "hobbyist possessor" of class III wildlife) requires every permit holder to "demonstrate consistent and sustained commercial activity in the form of exhibition or sale" of the wildlife the holder is authorized to possess. *Id.* 68A-6.0024(1).

The commission also regulates the size and composition of the facility that must be used to house captive wildlife. *Id.* 68A-6.0023; *see also id.* 68A-6.003–68A-6.004. The rules specifically regulate the size and construction of cages for exotic birds. *Id.* 68A-6.004(4)(r). The commission also considers, prior to issuance of a permit, the location and character of the property where captive wildlife will be housed. The way in which the commission has done so has changed over the years, however. Prior to 2008, the commission required applicants for class I and class II permits to show that the wildlife would be kept in "appropriate neighborhoods," which is also the term used in the commission's enabling statute.[7] *See id.* 68A-6.0022(5)(b) (2000); Fla. Stat. § 379.303(1) (2012). In 2008, the commission modified Rule 68A-6.003 entitled "Facility and Structural Caging Requirements of Class I, II and III Wildlife" to include certain requirements for properties housing captive wildlife. Among other things, this rule required applicants seeking permits for class I and class II wildlife to demonstrate the required cages and enclosures were not prohibited by any county or municipal ordinance. Fla. Admin. Code R. 68A-6.003(2) (2008). The rule also specifically prohibited certain class I wildlife from being housed on "property within an area zoned solely for residential use." *Id.* 68A-6.003(2)(c) (2008).

---

[7] Referring to the relevant Florida Statutes as "enabling" is a misnomer as the state legislature can only "enact laws in aid of the commission." Art. IV, § 9, Fla. Const.

The current version of Rule 68A-6.003 requires facilities for the housing of Class I and Class II wildlife to meet certain ownership requirements, be of a certain size, contain an appropriate buffer zone, and be enclosed by a perimeter fence. *Id.* 68A-6.003(2) (2010). While the commission has imposed additional requirements for facilities housing class III mammals, it does not impose any additional requirements for facilities housing class III birds. *Id.* 68A-6.003(2) (2010). Further, and in contrast to the requirements imposed on class I and class II wildlife in the past, the rule does not require applicants to show that the required cages and enclosures would not be prohibited by a county of municipal ordinance. *Id.* In place of such a requirement, the rule directs the commission's staff to provide notice of a permit application to the county or municipality in which a proposed Class I or Class II wildlife facility is located.[8] *Id.* Under the commission's rules, once it issues by a permit, the licensee is authorized to possess wildlife at the location identified in the permit. *Id.* 68A-6.0022(1).

## C.  Intersection of the Regulation of Land Use and Captive Wildlife

Plaintiffs' main legal theory is that the portions of Orange County's zoning ordinances that regulate commercial aviculture conflict with the Florida Constitution's grant of regulatory and executive authority over captive wildlife to the Fish and Wildlife Conservation Commission. Orange County, in contrast, casts this as a question of preemption. That is not the correct legal analysis, however. Under the correct analysis, the Court must ask first whether the commission is provided with constitutional authority over the subject matter of the challenged ordinance. If it is, then the ordinance is invalid. If not, then the Court must determine whether the scope of the statute is limited to

---

[8] The rules do not provide for such notice when the application is to possess class III wildlife.

subjects that fall outside of the commission's constitutional authority.

In *Whitehead v. Rogers*, 223 So. 2d 330 (Fla. 1968), the Supreme Court of Florida considered a conflict between the constitutional grant of power given to the Game Commission by the Florida Constitution of 1885 to regulate hunting seasons and a state statute of general application. A hunter was arrested for violating a statute that prohibited the discharge of firearms on Sundays. *Id.* at 331. The hunter possessed a valid hunting license issued by the Game Commission that authorized the licensee to hunt from a certain date to a certain date. *Id.* 330. One of the authorized dates was a Sunday. *Id.* Because the state legislature could enact only "laws in aid of, but not inconsistent with," the Game Commission's constitutional grant of authority, the court reasoned that the statute was void to the extent it prohibited an activity that was expressly authorized by the Game Commission. *Id.* at 330–31.

In *Askew v. Game and Fresh Water Fish Commission*, 336 So. 2d 556 (Fla. 1976), the Court was asked to void statutes which purported to allow a state agency to introduce non-native fresh water fish into Florida's waters without first obtaining a permit from the Game Commission. In reaching its decision, the court first construed the Game Commission's constitutional grant of authority, which provided that the "commission shall exercise the nonjudicial powers of the state with respect to wild animal life and fresh water aquatic life." *Id.* at 559 (construing Art. IV, § 9 of the Florida Constitution of 1968). The court noted that, "standing alone, . . . . Article IV, Section 9 of the Florida Constitution would require that the challenged statutes be held unconstitutional." *Id.* at 560. Nevertheless, the court noted that another constitutional provision provided the legislature with the power protect the state's natural resources. *Id.* Reasoning that the constitution should be read as a whole and that each of its parts

13

should be given meaning, the court concluded that the challenged statutes were a valid exercise of legislative authority granted by the second constitutional provision. *Id.*

The scope of authority granted to the Game Commission was challenged again in *Airboat Association of Florida, Inc. v. Florida Game and Fresh Water Fish Commission*, 498 So. 2d 629 (Fla. 1986). In that case, the Game Commission had promulgated rules that restricted the use of dogs and all-terrain vehicles for hunting wildlife in the Big Cypress Wildlife Management Area. *Id.* at 630. The petitioners challenged the rules under the state administrative procedure act; however, the court noted that the Game Commission, as a constitutional body, was not an agency within the meaning of the administrative procedure act. *Id.* at 631. The court also noted that the rules promulgated by the Game Commission were not rules but rather were "in the nature of legislative acts." *Id.* at 632.

Most recently, the Supreme Court of Florida construed the scope of the current commission's authority over all marine wildlife in *Caribbean Conservation Corp. v. Florida Fish & Wildlife Conservation Comm'n*, 838 So. 2d 492, 497–99 (Fla. 2003). In that case, a conservation group challenged certain statutes that purportedly usurped the commission's constitutional authority. *Id.* at 494. The court explained that, to determine whether a challenged statute is constitutional, a court must first determine whether the Florida Constitution provides the commission with constitutional authority over the subject matter of the statute. *Id.* at 500–01. If not, then the court should consider whether the scope of the statute is limited to subjects that fall outside of the commission's constitutional authority. *Id.* Using this framework, the court looked to the language used in the Florida Constitution and construed it "consistent with the intent of the framers and the voters." *Id.* at 501. The court also endeavored to read multiple

constitutional provisions *in pari materia* to ensure that each is given a consistent and logical meaning. *Id.*

In sum, Florida law provides that the state legislative power over captive wildlife was transferred to the Florida Fish and Wildlife Conservation Commission. Art. IV, § 9, Fla. Const.; *see also Sylvester v. Tindall*, 18 So. 2d 892, 900 (Fla. 1944). The effect of the transfer of that portion of the state's legislative power was to divest the state legislature of authority to regulate the possession and sale of captive wildlife, *Beck v. Game and Fresh Water Fish Commission*, 33 So. 2d 594, 595 (Fla. 1948), and vest that power in the commission, *State ex rel. Griffin v. Sullivan*, 30 So. 2d 919, 920 (Fla. 1947).[9] The commission therefore assumed the regulatory authority that the legislature had prior to the transfer. *Caribbean Conservation*, 838 So. 2d at 497. As such, the rules adopted by the commission are tantamount to legislative acts, *Airboat Ass'n of Florida, Inc.*, 498 So. 2d at 630, and become the governing law of the state, *Griffin*, 30 So. 2d at 920. Any and all laws in conflict with the commission's rules are consequently void. *Whitehead*, 223 So. 2d at 330–31.

Applying these principles, the Court concludes that Orange County cannot use its land use ordinances to regulate the possession or sale of captive wildlife. Those ordinances specifically seek to prohibit the use of Plaintiffs' residence for "commercial aviculture, aviaries" and the "breeding, keeping, and raising of exotic animals." Ch. 38,

---

[9] As the Florida Attorney General concluded shortly after the adoption of the Constitution of 1968, the commission has "replaced the legislature as the representative of the people." Op. Att'y Gen. Fla. 72-41 (1972). "The commission's decisions are the law" when its regulations concern "wild animal life and fresh water aquatic life" in Florida. *Id.*

Art. IV, § 38-78, OCC; *Id.* Art. VI, § 38-304, OCC.[10] Those land uses specifically target activities that fall within the exclusive authority of the commission,[11] whose rules on the topic are the governing law of the state. Orange County's prohibitions against land uses such as "commercial aviculture, aviaries" and "breeding, keeping, and raising of exotic animals" are in direct conflict with the commission's rules, which impose an obligation on the breeders of exotic birds to maintain a commercial enterprise. For this reason, Orange County's ordinances, to the extent that they regulate captive wildlife, and more specifically commercial aviculture, are inconsistent with general law and are therefore void.[12] *See, e.g., Grant*, 935 So. 2d at 523 (holding a charter county in Florida may only "enact county ordinances not inconsistent with general law").

Even if the Court were to accept Orange County's characterization of its ordinances as generally applicable—which it does not because the ordinances are not crafted in that way—Orange County still could not enforce its ordinances banning commercial aviculture against Plaintiffs. *See Whitehead*, 223 So. 2d at 330–31. In

---

[10]   Moreover, in its papers, Orange County admits that its ordinances specifically prohibit Plaintiffs from keeping, breeding, and raising exotic animals at their residence in addition to commercial aviculture. (Doc. 287, pp. 2–3.)

[11]   Thus, the case of *City of Miramar v. Bain*, 429 So. 2d 40, (Fla. 4th DCA 1983), is inapposite because the ordinances in that case did not specifically seek to regulate the possession of captive wildlife.

[12]   Indeed, Florida's Attorney General came to the same conclusion when he was asked to opine whether a non-charter county could enjoin "the possession, breeding or sale of non-indigenous exotic birds" using the county's land use ordinances. Op. Att'y Gen. Fla. 2002-23 (2002). Tellingly, Orange County has made no attempt in any of the papers filed in this case to distinguish its ordinances from those analyzed in the Attorney General's opinion, nor has Orange County attempted to explain why this Court should not be persuaded by the Attorney General's interpretation of Florida law. An opinion's arguments need not be compulsory in order to be compelling. While all too common, this ostrich-like tactic is generally not considered persuasive advocacy. *See, e.g., Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011) (noting that the "ostrich is a noble animal, but not a proper model for an . . . advocate.").

*Whitehead*, the Florida Supreme Court held that a statute prohibiting shooting on Sunday was void to the extent it prohibited an activity that was specifically authorized by the Game Commission. *Id.* at 330–31. Like the hunter in *Whitehead*, who was issued a permit by the Game Commission that authorized him to hunt on Sunday, Plaintiffs were issued a permit by the commission authorizing them to possess and sell class III birds from their residence. *See id.* Thus, like the statute in *Whitehead*, Orange County's ordinances are void to the extent such ordinances prohibit Plaintiffs from possessing and selling class III birds from their residence. *See id.*

\*   \*   \*   \*   \*

For these reasons, the Court concludes that Plaintiffs are entitled to summary judgment on their state law declaratory judgment claims that Orange County's ordinances are void.

## II. Plaintiffs' Federal Claims

The Court construes the amended complaint as bringing five federal claims, each of which is discussed below.

### A. Due Process

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has interpreted this clause to provide for two different kinds of constitutional protection: substantive due process and procedural due process. *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc). Plaintiffs bring only substantive due process claims, which this Court must carefully analyze to determine the nature of the rights of which Plaintiffs have been deprived. *DeKalb Stone, Inc. v. County of DeKalb*, 106 F.3d 956, 959 (11th Cir. 1997).

Plaintiffs assert two possible bases for their claims.[13] They contend first that Orange County's zoning ordinances are *ultra vires* and, therefore, are arbitrary and irrational. (Doc. 162, ¶ 57.) Plaintiffs also contend that Orange County's decision to uphold the zoning manager's determinations that a commercial aviary is not a permissible use of a residential-only zoned property, and that a commercial aviculture operation also cannot be a home occupation are substantive due process violations. (*Id.* ¶ 94.)

In order to address these claims, the Court will first review the law applicable to substantive due process claims. The Court will then apply that law to the two possible bases for Plaintiffs claims to see if they can state a claim under federal law. Then, the Court will discuss whether Plaintiffs' chief complaint—that Orange County's zoning ordinances are *ultra vires*—may state a substantive due process claim.

## 1. Applicable Law

The substantive component of the Due Process Clause protects those rights that are fundamental—that is, rights that are "implicit in the concept of ordered liberty." *McKinney*, 20 F.3d at 1556. Fundamental rights are those protected by the U.S. Constitution. *Id.* Substantive rights that are created by state law are generally not subject to substantive due process protection. *Id.* Land use regulations like those at issue in this case are state-created rights that are not protected by substantive due process. *Greenbriar Village, L.L.C. v. Mountain Brook*, 345 F.3d 1258, 1262 (11th Cir.

---

[13] The Court concludes without further analysis that a third possible basis—the actions of the county code enforcement personnel and the outcome of the code enforcement board proceeding—cannot support a substantive due process claim.

Furthermore, because Plaintiffs have refused to characterize their challenge as a regulatory takings claim, the Court declines to analyze their substantive due process challenge as a regulatory taking claim.

2003). There is an exception to this general rule, however.[14]

If a person's state-created rights are infringed by a "legislative act," the substantive component of the Due Process Clause will protect that person from a government's arbitrary and irrational action. *Lewis v. Brown*, 409 F.3d 1271, 1273 (11th Cir. 2005). The availability of this type of claim turns on the legislative nature of the government's action. If the action is executive in nature, then violations of state-created rights cannot support a substantive due process claim, even if the plaintiff alleges that the government acted arbitrarily and irrationally. *Greenbriar Village*, 345 F.3d at 1263.

The Eleventh Circuit describes executive acts as those acts that "apply to a limited number of persons (and often only one person)" and which "typically arise from the ministerial or administrative activities of members of the executive branch." *McKinney*, 20 F.3d at 1557 n.9. An example of an executive act that is not subject to substantive due process is the enforcement of existing zoning regulations. *DeKalb Stone, Inc.*, 106 F.3d at 959. Legislative acts, in contrast, "generally apply to larger segments of—if not all—society." *Id.* The Eleventh Circuit cites "laws and broad-ranging executive regulations" as common examples of legislative acts. *Id.*

### 2. Can Plaintiffs State a Claim?

In this case, the first basis for Plaintiffs' substantive due process claim can be construed as a challenge of a legislative act. It is a claim that Orange County has attempted to regulate land use in a manner that it could not under the organic law of Florida. The zoning ordinances challenged by Plaintiffs apply to all the real property

---

[14] Plaintiffs recognize and raise this exception to the general legal principle. Orange County, however, failed to address the legislative act exception in its papers, relying instead on the general principle that state-created rights cannot form the basis of a substantive due process claim.

located in the county. They are broad-ranging and applicable to a large portion of county residents.

The second basis for Plaintiffs' claim, however, requires closer scrutiny. Plaintiffs challenge Orange County's decision to uphold the determinations of the county zoning manager that a commercial aviary is not an authorized use in the residential zoning category applicable to Plaintiffs' residence, and that operation of a commercial aviary is not an authorized home occupation under the zoning regulations. The chain of events began when Plaintiffs requested an "official determination" from the zoning manager as to whether the operation of a commercial aviary at their residence was permitted by the zoning code. (Decl. ¶¶ 67–69.) The zoning manager concluded that a commercial aviary was not permitted in the residential-only zoned areas. (Id. ¶ 81.) Plaintiffs appealed to the Board of Zoning Adjustment, which upheld the zoning manager's interpretation of the zoning ordinances. (Id. ¶¶ 85, 92.) Plaintiffs then appealed part of the board's decision to the Board of County Commissioners. (Decl. ¶ 101.)

At bottom, the second factual basis for Plaintiffs' substantive due process claim is a dispute over how Orange County interprets its existing zoning ordinances. Plaintiffs sought to persuade the county that a commercial aviary would be a permissible use of their residentially zoned property or that a home occupation (as that term is used in the zoning ordinances) could encompass the operation of a commercial aviary. They were unsuccessful. The county zoning manager, the country Board of Zoning Adjustments, and the Board of County Commissioners all decided that Plaintiffs' interpretation of the existing zoning ordinances was incorrect. The interpretation of existing laws is not a legislative function; it is an executive act usually intertwined with an enforcement

action.[15] While Plaintiffs asked the county directly for an interpretation in this case, the nature of the action is the same—the county was interpreting the existing law.[16] That is an executive act that cannot serve as the basis for a substantive due process claim.

Thus, to the extent Plaintiffs can bring a substantive due process claim, such claim must be based on the contention that the enactment of Orange County's land use ordinances was an arbitrary and irrational legislative act.

### 3.  Do Plaintiffs Support Such a Claim?

As discussed above, the provisions of Orange County's land use ordinances that regulate captive wildlife are void. The ordinances are also unenforceable against the holders of permits issued by the commission that authorize the possession and sale of captive wildlife at a particular facility. These ordinances do not, however, implicate fundamental rights protected by the substantive component of the Due Process Clause. The ordinances implicate only property rights, which are the creature of state law.

Where a person's state-created rights are infringed by a legislative act, the Due

---

[15]  The ordinance that created Board of Zoning Adjustment tasked it with, among other things, hearing and deciding "appeals taken from the requirement, decision or determination made by the planning or zoning department manager where it is alleged that there is an error in the requirement, decision or determination made by said department manager in the *enforcement of zoning regulations*." Art. V, § 502, Orange County Charter (emphasis added).

[16]  The Eleventh Circuit reached a similar conclusion in *Boatman v. Town of Oakland*, 76 F.3d 341 (11th Cir. 1996), when it rejected a property owner's assertion that he had a substantive due process "right to a correct decision from a government official." In that case, a building inspector decided that the property owner's building was a mobile home that was prohibited by the applicable zoning ordinance. *Id.* at 345. The inspector therefore refused to inspect the property and issue a certificate of occupancy. *Id.* The property owner, who was also a member of the town zoning board, disagreed with the building inspector's interpretation of the zoning ordinance. *Id.* When the town council agreed with the inspector's interpretation of the ordinance, the property owner sued, arguing that the town's refusal to perform the inspection was arbitrary in violation of their federal due process rights. *Id.* The Eleventh Circuit concluded that such a "claim is not cognizable under the substantive component" of the Due Process Clause. *Id.*

Process Clause protects that person from arbitrary and irrational governmental action. *Lewis*, 409 F.3d at 1273. As there is no evidence in the record that enactment of Orange County's land use ordinances targeted a protected class, the Court must apply the rational basis test. *See Schwarz v. Kogan*, 132 F.3d 1387, 1390 (11th Cir. 1998) (holding substantive due process claims that do not involve a person's fundamental rights are reviewed under the highly deferential rational basis standard). "In order to survive this minimal scrutiny, the challenged provision need only be rationally related to a legitimate government purpose." *Id.* at 1390–91. The Court must first identify "a legitimate government purpose . . . which the enacting government body could have been pursuing." *Bannum, Inc. v. City of Fort Lauderdale*, 157 F.3d 819, 822 (11th Cir. 1998) (internal quotations omitted) (emphasis in original). The Court must then determine "whether a rational basis exists for the enacting government body to believe the legislation would further the hypothesized purpose." *Id.* So long as there is a "plausible, arguably legitimate purpose" for the enactment of Orange County's land use ordinances, summary judgment is appropriate unless Plaintiffs can demonstrate that the county could not possibly have relied on that purpose. *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214–15 (11th Cir. 1995).

Orange County advances a plausible, reasonable, and sound purpose—to promote the health, safety, and welfare of its citizens—to support its land use ordinances. Plaintiffs fail to demonstrate that the county could not possibly have relied on that purpose—indeed, they advance no evidence whatsoever that Orange County was not motivated to protect the health, safety, and welfare of its citizens when the land use ordinances were enacted.

Accordingly, the Court finds it appropriate to grant summary judgment in favor of

Orange County and against Plaintiffs on their substantive due process claims.[17]

## B. Equal Protection

To prevail on their class of one equal protection claim, Plaintiffs must show evidence that they were intentionally treated differently from others who were "similarly situated" and that there was no rational basis for the difference in treatment. *Grider v. City of Auburn*, 618 F.3d 1240, 1263–64 (11th Cir. 2010). A similarly situated comparator must be defined and identified precisely; a plaintiff cannot rely upon "broad generalities" to establish his claim. *Id.*

In this case, Plaintiffs suggest that the proper comparator is commercial businesses that are authorized land uses in residential zoned areas. The Court disagrees. The similarly situated requirement must be rigorously applied in the context of a class of one claim. *Lieb v. Hillsborough Cnty. Public Transp. Comm'n*, 558 F.3d 1307, 1307 (11th Cir. 2009). Here, the comparison is not between commercial aviaries and all other businesses. The proper comparator is a person who the county allows to possess and sell captive wildlife from a property that is zoned residential only. Plaintiffs do not identify, and advance no evidence of, any such similarly situated comparator.

Therefore, the Court finds summary judgment is due to be granted in favor of

---

[17] It may seem incongruent to conclude that an ordinance is void under state law while at the same time finding that the substantive component of the Due Process Clause are not violated by the void ordinance. The fact is, however, that the only substantive due process claim that is viable here—a claim that a legislative act violated due process—does not rise or fall on the lawfulness of the state legislation. In other words, this type of substantive due process claim is not a challenge to the ordinance qua ordinance. Rather the claim is based upon the arbitrary and capricious action of the government in *enacting* the ordinance. *See, e.g.*, *Villas of Lake Jackson, Ltd. v. Leon Cnty.*, 121 F.3d 610, 615 (11th Cir. 1997) (holding that a "substantive due process claim based upon the arbitrary and capricious action of the government in adopting the regulation" is one of only four causes of actions for violations of an individual's constitutional rights arising in the context of "zoning regulations governing a specific use of real property").

Orange County and against Plaintiffs on their equal protection claims.

### C. Compelled Speech

Plaintiffs claim that Orange County's land use special exception requirement and determination procedure violate their rights under the First Amendment.[18] The Court understands this claim to be that, by requiring Plaintiffs to submit to the special exception procedure, the ordinances force Plaintiffs to engage in speech—that is, the engagement of land use proceedings—that they prefer not to participate in. The Court also understands Plaintiffs to claim that they were compelled to request a determination from the zoning manager to challenge the validity of the ordinances. Neither of these arguments can form the basis for a claim under the compelled speech doctrine.

It has long been held that the First Amendment prohibits the government from compelling citizens to express *beliefs* that they do not hold, *see, e.g.*, *West Virginia State Bd. of Ed. v. Barnett*, 319 U.S. 624 (1943) (holding that school children could not be forced to recite the pledge of allegiance), and prevent the stifling of "speech on account of its message," *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Zoning regulations that are content-neutral are not compelled speech. *See, e.g.*, *Demarest v. City of Leavenworth*, 876 F. Supp. 2d 1186, 1197 (E.D. Wash. 2012) (concluding zoning restrictions on signage do not compel land owners to engage in speech). Orange County's land use procedures are content-neutral in that they do not

---

[18]  The Court assumes that Plaintiffs' compelled speech, commercial speech, and search and seizure claims are ripe and sufficiently defined to permit adjudication because Orange County's ripeness arguments address only the substantive due process claims. There is some doubt whether all of Plaintiffs' other federal claims are justiciable, however, because some claims are based on Plaintiffs' objections to the special exception requirement of Orange County land use regulations. Under the Code, that procedure can be used only in connection with Plaintiffs' rural property. The Court will consider Plaintiffs' claim on the merits nonetheless.

direct the content of such speech, nor do they compel any land owner to engage in speech. The special exception requirement is the process that a land owner must engage if he wishes to be authorized to use his property in a particular manner. Likewise, Plaintiffs were not required to seek a determination from the zoning manager to challenge the validity of the ordinances. Plaintiffs fail to state a compelled speech claim.

The Court therefore finds summary judgment is due to be granted in favor of Orange County and against Plaintiffs on their compelled speech claims.

### D.  Commercial Speech

Plaintiffs also claim that section 38-1 of the Orange County Code is an impermissible prior restraint of their commercial speech rights. Orange County argues that the zoning manager's determination that Plaintiff could not maintain a commercial aviary at their residence did not "censor" Plaintiffs' commercial speech. (*See, e.g.*, Doc. 261, p. 23.) Despite Orange County's failure to squarely address Plaintiffs' commercial speech claim,[19] the Court must consider whether there is a legal basis for such claim.

The First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from unwarranted governmental regulation. *See, e.g.*, *Virginia Pharmacy Bd. V. Virginia Citizens Consumer Council*, 425 U.S. 748,

---

[19]  The briefing in this action is particularly troubling. Plaintiffs, who do not have the benefit of counsel, have framed their clams to avoid most common pitfalls and have raised some valid arguments in response to Orange County's legal positions (such as the legislative act exception to the prohibition on substantive due process claims for state-created rights). Orange County, which is represented by counsel, by contrast repeatedly fails to address the exact claims raised by Plaintiffs or the legal authorities identified by Plaintiffs that are adverse to Orange County's positions. Portions of Orange County's briefs are supported by no legal authority whatsoever. The Court will not speculate as to why Orange County chose to brief the case in this manner. The Court does note, however, that the county's choice has caused this action to consume more judicial resources than are typically required to adjudicate *pro se* actions.

761–62 (1976). Commercial speech, however, "enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial speech." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995). Indeed, the seminal case in this area, *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 571 n.13 (1980), observed "that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it."

The Court need not reach that far, however, because it concludes that section 38-1 of the Orange County Code does not regulate commercial speech. That provision of the Code contains the definition that Orange County uses to determine when real property is being used for the purposes of commercial aviculture. It is this activity that is regulated by the Code, not commercial speech. As a result the First Amendment is not implicated. *See ABC Home Furnishings, Inc. v. Town of E. Hampton*, 947 F. Supp. 635, 643 (E.D.N.Y. 1996) (holding that a town's revocation of an event permit did not give rise to a commercial free speech claim because, while the town did receive complaints about the event advertising, the town's revocation was an effort to regulate the event, "i.e., the activity underlying the speech, not the speech itself"); *see also Jim Gall Auctioneers, Inc. v. City of Coral Gables*, 210 F.3d 1331, 1333 (11th Cir. 2000) (noting that the "right to hold an auction" is arguably not protected commercial speech). Plaintiffs fail to state a commercial speech claim.

Therefore, the Court finds summary judgment is due to be granted in favor of Orange County and against Plaintiffs on their commercial speech claims.

### E.  Search and Seizure

Lastly, Plaintiffs claim that they were subjected to an unreasonable search and seizure that violated their rights under the Fourth Amendment. They contend that the special exception requirement subjects them to "search by public hearing" and the "seizure of fees." They also contend that the county's zoning determination procedure is an unreasonable search and seizure.

First, Plaintiffs cannot establish that the hearing procedures for a special exception and a zoning determination are protected by the Fourth Amendment. Plaintiffs have no expectation of privacy in relation to such hearings. Indeed, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). Plaintiffs knowing and voluntary engagement of these proceedings take them outside the protections of the Fourth Amendment.

Second, the voluntary payment of governmental fees is not subject to protection under the Fourth Amendment. *See, e.g.*, *Fox v. District of Columbia*, No. 10-2118, 2013 WL 563640, at *3 (D.C.D.C. Feb. 15, 2013) (holding that the voluntary payment of a fee in a procedure that allows a arrestee to pay and forfeit the fee for immediate release from jail without prosecution is not protected under the Fourth Amendment). To establish an unlawful seizure, Plaintiffs must demonstrate that the payment of the fees constitutes a seizure that is unreasonable. *Soldal v. Cook Cnty.*, 506 U.S. 56, 61–62 (1992). "A seizure is not unreasonable if it occurs with the non-coercive, voluntary consent of the owner." *Fox*, 2013 WL 563640, at *3 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Here, both the special exception and the zoning determination procedures used by Orange County are proceedings that a land owner must voluntarily

initiate. The payment of fees associated with such proceedings is likewise voluntary and therefore outside the protections of the Fourth Amendment. Plaintiffs do not state a claim for the violations of their rights under the Fourth Amendment.

The Court therefore finds summary judgment is due to be granted in favor of Orange County and against Plaintiffs on their search and seizure claims.

**CONCLUSION**

Accordingly, it is hereby **ORDERED AND ADJUDGED**:

1. Orange County's Motion to Dismiss (Doc. 175) is **DENIED AS MOOT**.

2. Orange County's Dispositive Motion for Summary Judgment (Doc. 261) is **GRANTED IN PART** and **DENIED IN PART**.

3. Plaintiffs' Motion for Summary Judgment and Partial Summary Judgment (Doc. 269) is **GRANTED IN PART** and **DENIED IN PART**.

4. The Court grants summary judgment in favor of Plaintiffs and against Defendant Orange County on Plaintiff's state-law declaratory judgment claims that Orange County's land use regulations are unlawful. As discussed in this Order, the portions of Orange County's land use regulations that prohibit "commercial aviculture, aviaries" and "breeding, keeping, and raising of exotic animals" are inconsistent with general law of Florida and are therefore void. The Court grants summary judgment in favor of Orange County and against Plaintiffs on all of the remaining claims.

5. The sole remaining issue in this action is the remedy available pursuant to Plaintiffs' state law declaratory judgment claim. The parties are directed to confer and advise the Court on or before September 6, 2013, of the

remedies available to Plaintiffs under state law.

6.      The trial and pretrial hearing dates are vacated, as are all deadlines except those imposed in this Order. The clerk is directed to terminate any motion that remains pending after entry of this Order.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 13, 2013.


ROY B. DALTON JR.
United States District Judge


Copies:
Counsel of Record